# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>MAURICIO CHAHINE<br><br>Defendant(s) | Case No. 3:24-mj- 1523-LLL |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  May 16 - September 4, 2024  in the county of  Duval  in the  Middle  District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(3) | Money laundering |

This criminal complaint is based on these facts:
See Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Christopher Pekerol, Special Agent, IRS-CI
Printed name and title

Sworn to before me and signed in my presence.

Date: 11-12-24

_____
Judge's signature

City and state: Jacksonville, Florida

Samuel J. Horovitz, United States Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Christopher Pekerol, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of a criminal complaint charging Mauricio Chahine ("CHAHINE") with violating 18 U.S.C. § 1956(a)(3) (money laundering).

2. I am a Special Agent with the Internal Revenue Service-Criminal Investigation Division ("IRS-CI") and have been so employed since February 2011. I am currently assigned to a North Florida High Intensity Drug Trafficking Area task force that investigates large-scale drug trafficking and money laundering organizations. I possess a Bachelor of Science in finance and a Master of Business Administration in finance from Florida State University. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the IRS Special Agent Investigative Techniques Program at the National Criminal Investigation Training Academy. In these two programs, I studied a variety of law enforcement, criminal investigation, and financial crime issues, including: search and seizure, violations of federal law, and IRS procedures and policies in criminal investigations. During the course of my career, I have participated in numerous investigations of large-scale drug trafficking and money laundering organizations, during which I traced illicit funds, conducted physical surveillance, executed search and seizure warrants, and debriefed confidential sources

and cooperating defendants. Through these investigations, training, experience, and conversations with other agents and law enforcement officers, I have become familiar with the methods drug traffickers and money launderers use to execute their schemes and launder illicit proceeds.

3. Based on my training and experience, I know that under 18 U.S.C. § 1956(a)(3), it is unlawful to conduct or attempt to conduct a financial transaction involving property represented to be the proceeds of certain specified unlawful activities, including drug trafficking, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of a specified unlawful activity; or to avoid a transaction reporting requirement under state or federal law. Based on the facts set forth below, there is probable cause to believe that CHAHINE has violated 18 U.S.C. § 1956(a)(3).

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause to charge CHAHINE and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. IRS-CI and DEA are currently investigating a large-scale money laundering organization operating in Jacksonville, Florida, and elsewhere. During the

investigation, DEA learned from a confidential source[1] ("CS-1") that CHAHINE is a U.S.-based money launderer with the ability to launder funds from the United States to other countries. CS-1 provided 313-802-8080 as the phone number used by CHAHINE. Records obtained from T-Mobile show 313-802-8080 is subscribed to CHAHINE.

6. On March 5, 2024, a DEA Special Agent acting in an undercover capacity ("UCA-1") contacted CHAHINE at 313-802-8080. UCA-1 told CHAHINE that CS-1 referred him/her and that UCA-1 works with South American people. UCA-1 told CHAHINE that he/she would like to talk face-to-face and CHAHINE agreed. On March 17, 2024, and March 19, 2024, UCA-1 contacted CHAHINE at 313-802-8080 to finalize the meeting, which was set for March 28, 2024, in Jacksonville, Florida. These contacts with CHAHINE were documented by UCA-1 in a report, which I have reviewed.

7. On March 28, 2024, UCA-1 and a DEA Task Force Officer acting in an undercover capacity ("UCA-2") met with CHAHINE at a restaurant located in Jacksonville, Florida, to discuss future money laundering transactions with CHAHINE. DEA agents and I established surveillance in the area of the restaurant and observed CHAHINE arrive at the meeting location driving a black Ford F-150

---

[1] As utilized herein, CS-1 is a paid DEA confidential source. CS-1 has no known criminal history and I have not discovered information that CS-1 has provided to be false or misleading. As detailed below, there has been independent corroboration of what CS-1 conveyed to law enforcement.

truck. The surveillance team identified CHAHINE by comparing his appearance to his driver's license photograph. The meeting was recorded by the UCAs. I have reviewed that recording. UCA-1 and UCA-2 introduced themselves and told CHAHINE, in substance, that they needed some help moving money around. CHAHINE said he needed to know how much money, where it was going, and how fast they needed it at the destination.

8. In substance, CHAHINE told the UCAs that he could collect bulk currency in the United States and payout the funds in various other countries. During the meeting, UCA-2 asked CHAHINE if he had an idea of what UCA-2 did. CHAHINE replied that he did not care what UCA-2 did. UCA-2 then told CHAHINE that he sells some of the white stuff, referring to cocaine. CHAHINE responded that he did not want to know. UCA-2 said that they will just call it "Coca-Cola." UCA-2 went on to explain that due to his work, he has large amounts of bulk currency in different places. CHAHINE reiterated that all he needed to know was where the money was going and how they wanted it, "big bills or small bills." CHAHINE said his fee was 12% for amounts over $200,000 and 15% for amounts under $200,000. CHAHINE suggested during the meeting that they may need to create invoices to make it appear as though they were buying or selling merchandise.

9. During the meeting, CHAHINE explained how he had multiple businesses and offered to move money through his bank accounts. CHAHINE mentioned during the meeting that he would not deposit currency he received from the UCAs all at once; instead, he would split it up and deposit the money in increments

4

of $5,000, $6,000, or $7,000. Based on CHAHINE's statements, it appeared that he intended to structure cash deposits to evade the reporting requirements of 31 U.S.C. § 5313.[2]

10. On May 8, 2024, UCA-1 contacted CHAHINE and advised that someone would be contacting him on behalf of UCA-1 and UCA-2. UCA-1 told CHAHINE that this person worked for them (referring to UCA-1 and UCA-2). Thereafter, an IRS-CI special agent acting in an undercover capacity ("UCA-3") called CHAHINE and arranged for an in-person meeting.

11. On May 16, 2024, UCA-3 and CHAHINE met at a restaurant located in Jacksonville, Florida. DEA and IRS-CI agents, including myself, established

---

[2] Section 5313 and 31 C.F.R. Chapter X of the Bank Secrecy Act (BSA) require any financial institution that engages with a customer in a currency transaction (i.e., a deposit or withdrawal) in excess of $10,000 to report the transaction to the IRS on Form 4789, Currency Transaction Report (CTR). These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any one business day. CTRs are often used by law enforcement to uncover a wide variety of illegal activities including money laundering. Many individuals involved in these illegal activities are aware of such reporting requirements and take active steps to attempt to cause financial institutions to fail to file CTRs. These active steps are often referred to as "structuring" and involve making multiple cash deposits, in amounts no greater than $10,000, to multiple banks, branches of the same bank and/or different accounts on the same day or consecutive days. Structuring is prohibited by 31 U.S.C. § 5324(a)(3).

5

surveillance in the area of the restaurant and observed CHAHINE arrive. The meeting was recorded by UCA-3, and I have reviewed that recording.

12. UCA-3 introduced himself/herself and explained to CHAHINE that he/she works with UCA-2 and deals with money for the organization. UCA-3 inquired about laundering money domestically. CHAHINE, in substance, said he had three businesses, Arby's Seafood and Chicken, SUNY Enterprise, and Albarakah Supermarket, and discussed using the businesses to launder money. CHAHINE said he could accept bulk currency and return the funds to UCA-3 by check or wire transfer from his business bank accounts. CHAHINE said that he may need invoices from UCA-3 to justify the payments from his businesses to UCA-3. CHAHINE agreed to launder money domestically for UCA-3 in exchange for a 12% fee and return the funds via wire transfer. After negotiating the fee, UCA-3 told CHAHINE that UCA-2 does not mind losing any kilos of cocaine, but if he loses the money from it, "we got problems." CHAHINE acknowledged and said if I cannot do it, I am going to tell you slow down. Later in the conversation, UCA-3 again mentioned that his money came from cocaine trafficking, by stating the money comes from the white and CHAHINE responded, I know, I know.

13. At the end of the meeting, UCA-3 provided CHAHINE a bag containing $50,000 of U.S. currency to be laundered to an undercover IRS-CI bank account. DEA and IRS-CI agents observed CHAHINE leave the meeting location with the currency. CHAHINE then travelled to his residence located at 4448 Edenfield Lane, Jacksonville, Florida. I reviewed Duval County property records, which show

CHAHINE currently owns the property located at 4448 Edenfield Lane, Jacksonville, Florida. I also reviewed JEA utility records, which showed that CHAHINE is a JEA customer with service at 4448 Edenfield Lane, Jacksonville, Florida.

14. I reviewed a DEA report of the undercover meeting and the surveillance team's observations. DEA followed CHAHINE when he departed the meeting location. As CHAHINE travelled on I-95, his speed varied from driving under the speed limit to over the speed limit. CHAHINE also changed lanes several times even though he passed few vehicles. At one point, CHAHINE was in the middle lane and then suddenly cut across two lanes to exit I-95. CHAHINE then travelled through seemingly random neighborhoods. DEA observed CHAHINE momentarily park in a driveway and then go back the way he originally came from. Based on my knowledge and experience, these driving tactics are commonly used by people involved in criminal activity as a means of conducting counter surveillance. After CHAHINE arrived at his residence, DEA terminated its surveillance to avoid detection.

15. I have reviewed the bank records for the undercover IRS-CI bank account and learned that over the following week, CHAHINE returned the funds, less his fee, via a series of wire transfers to the IRS-CI bank account.

16. Based on a review of the transactions, it appears that CHAHINE laundered the currency through multiple business bank accounts, in amounts under $10,000, just as he told the UCAs he would.

17. The following is a summary of those transactions:

| Date | Amount | Sender Account Name | Sender Bank |
|---|---|---|---|
| 5/20/2024 | $9,800.00 | Petrolead Technologies Inc of Jacksonville | Wells Fargo Bank |
| 5/20/2024 | $9,900.00 | Petrolead Technologies Inc of Jacksonville | JP Morgan Chase Bank |
| 5/20/2024 | $7,058.00 | SUNY Enterprise Inc. | Fifth Third Bank |
| 5/20/2024 | $8,900.00 | Arbys Seafood and Chicken Inc. | Vystar Credit Union |
| 5/21/2024 | $2,700.00 | Arbys Seafood and Chicken Inc | Fifth Third Bank |
| 5/21/2024 | $3,800.00 | Albarakah International Grocery Inc. | VystarCredit Union |
| 5/24/2024 | $1,842.00 | SUNY Enterprise Inc. | Fifth Third Bank |
| Total | $44,000.00 | | |

18. I reviewed Florida Department of Corporations records, which show CHAHINE is the sole officer of his three businesses: Arbys Seafood and Chicken Inc., Albarakah International Grocery Inc., and SUNY Enterprises Inc.

19. On or about June 7, 2024, UCA-3 and an IRS-CI task force officer acting in an undercover capacity ("UCA-4") met with CHAHINE at a restaurant located in Jacksonville, Florida. Prior to the meeting, DEA and IRS-CI agents, including myself, established surveillance in the area of the restaurant. The meeting was recorded by the UCAs, and I have reviewed that recording. I reviewed a DEA report of the undercover meeting and the surveillance team's observations.

20. During the meeting, CHAHINE, in substance, said he has been in the money laundering business for a long time and works with people in Colombia, Venezuela, and Panama. CHAHINE explained how he overvalues goods shipped internationally as a way of justifying international transfers of funds. At the end of the meeting, the UCAs delivered a bag containing $56,000 of U.S. currency to CHAHINE to be laundered to an IRS-CI undercover bank account. DEA followed CHAHINE when he departed the meeting location. CHAHINE again drove in a manner

8

consistent with an individual conducting counter surveillance, similar to his activity on May 16, 2024. The surveillance team followed CHAHINE to his residence and then terminated surveillance.

21. I have reviewed the bank records for the undercover IRS-CI bank account and learned the funds were returned by CHAHINE, less his fee, via a series of wire transfers. The following is a summary of those transactions:

| Date | Amount | Sender Account Name | Sender Bank |
|---|---|---|---|
| 6/10/2024 | $9,965.00 | Petrolead Technologies Inc of Jacksonville | JP Morgan Chase Bank |
| 6/11/2024 | $8,300.00 | Arbys Seafood and Chicken Inc. | Fifth Third Bank |
| 6/11/2024 | $9,960.00 | Petrolead Technologies Inc of Jacksonville | Wells Fargo Bank |
| 6/14/2024 | $8,750.00 | Albarakah International Grocery Inc. | Vystar Credit Union |
| 6/18/2024 | $13,000.00 | Petrolead Technologies Inc of Jacksonville | JP Morgan Chase Bank |
| Total | $49,975.00 | | |

22. On June 28, 2024, UCA-4 briefly met with CHAHINE in a parking lot in Jacksonville, Florida. The meeting was recorded by UCA-4, and I have reviewed that recording and have spoken to UCA-4 about the meeting. DEA and IRS-CI agents, including myself, established surveillance in the area. CHAHINE arrived at the meeting location and parked near UCA-4. UCA-4 then handed CHAHINE a bag containing $55,975 of U.S. currency. CHAHINE loaded the currency into his vehicle and departed the meeting location.

23. I have reviewed the bank records for the undercover IRS-CI bank account and learned the funds were returned by CHAHINE, less his fee, via a series of wire transfers. The following is a summary of those transactions:

| Date | Amount | Sender Account Name | Sender Bank |
|---|---|---|---|
| 7/1/2024 | $10,000.00 | Petrolead Technologies Inc of Jacksonville | JP Morgan Chase Bank |
| 7/2/2024 | $10,000.00 | Petrolead Technologies Inc of Jacksonville | Wells Fargo Bank |
| 7/3/2024 | $7,550.00 | Albarakah International Grocery Inc. | Vystar Credit Union |
| 7/8/2024 | $7,830.00 | Arbys Seafood and Chicken Inc. | Fifth Third Bank |
| 7/8/2024 | $8,155.00 | Arbys Seafood and Chicken Inc. | Vystar Credit Union |
| 7/11/2024 | $6,465.00 | Arbys Seafood and Chicken Inc. | Fifth Third Bank |
| Total | $50,000.00 | | |

24. On July 8, 2024, CHAHINE contacted UCA-3 over WhatsApp.[3] I reviewed the WhatsApp messages exchanged between UCA-3 and CHAHINE. CHAHINE requested invoices from UCA-3 to show that UCA-3 purchased restaurant equipment from Arbys Seafood and Chicken Inc. and Albarakah International Grocery Inc. IRS-CI then created fictitious invoices as directed by CHAHINE, and on July 12, 2024, UCA-3 sent the fictious invoices to CHAHINE via WhatsApp.

25. On July 15, 2024, UCA-3 communicated with CHAHINE via WhatsApp to arrange for the delivery of currency to CHAHINE on July 17, 2024. Thereafter, on July 17, 2024, UCA-4 briefly met with CHAHINE in a parking lot in Jacksonville, Florida. Prior to the meeting, DEA and IRS-CI agents, including myself, established surveillance in the area of the parking lot. The meeting was recorded by UCA-4, and I have reviewed that recording. UCA-4 delivered $56,000 of U.S. currency to CHAHINE. CHAHINE loaded the currency into his vehicle and then departed. DEA followed CHAHINE and observed him drive to his residence, 4448

---

[3] WhatsApp is an encrypted instant messaging and voice-over-IP service. It allows users to send text, voice messages, video messages, make voice and video calls, and share images, documents, user locations, and other content.

Edenfield Lane, Jacksonville, Florida. Surveillance was terminated shortly after CHAHINE arrived at his residence to avoid detection.

26. I reviewed the bank records for the undercover IRS-CI bank account, which showed that on July 18, 2024, the account received two wire transfers. One wire transfer was in the amount of $7,015 and was sent from a Vystar Credit Union account held by Arby's Seafood and Chicken Inc. The other wire transfer was in the amount of $7,985 and was sent from a Fifth Third Bank account held by Arby's Seafood and Chicken Inc. Arby's Seafood and Chicken Inc. is an entity CHAHINE used to launder money during the previous transactions with UCA-3.

27. On September 4, 2024, CHAHINE contacted UCA-3 via WhatsApp. I reviewed the WhatsApp messages exchanged between UCA-3 and CHAHINE and I have talked to UCA-3 about the communications UCA-3 had with CHAHINE. CHAHINE said, in substance, that the bank account containing the $35,000 he owes UCA-3 was frozen and is under investigation by the bank. CHAHINE requested that UCA-3 send him an invoice showing the purchase of solar panels by UCA-3 from Petrolead Technologies Inc. of Jacksonville. IRS-CI then created a fictitious invoice as directed by CHAHINE, and on September 5, 2024, UCA-3 sent the false invoice to CHAHINE. I have reviewed the false invoice and the WhatsApp messages concerning it.

## CONCLUSION

28. Based on the foregoing, there is probable cause to believe that on and between May 16 and September 4, 2024, CHAHINE engaged in money laundering in the Middle District of Florida in violation of 18 U.S.C. § 1956(a)(3).

Respectfully submitted,

Christopher Pekerol
Special Agent
Internal Revenue Service – Criminal Investigation

Subscribed and sworn to before me on November __12th__, 2024.

SAMUEL J. HOROVITZ
United States Magistrate Judge